SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

William GOREN and New Age Financial Services, Inc., Defendants.

and

New Times Securities Services, Inc., Relief Defendant.

No. 00–CV–970TCPETB.

United States District Court, E.D. New York.

July 17, 2003.

Karen A. Caplan, Hughes Hubbard & Reed LLP, New York City, Stephen P.

Harbeck, Washington, DC, for Securities Investor Protection Corp.

Andrew Donner, Honigman & Donner, LLP, Melville, NY, for Joseph Falcone.

Andrew Kress, Kaye, Scholier, Fierman, Hays & Handler, New York City, for Richard L. Stone.

Gerald A. Gross, Kay L. Lackey, Edwin Henry Nordlinger, U.S. S.E.C., New York City, for Securities and Exchange Com'n.

David H. Wander, Wander & Associates, P.C., New York City, for D. Reis Contracting Corp.

### MEMORANDUM AND ORDER

PLATT, District Judge.

Presently before the Court are objections to the Report and Recommendation issued by United States Magistrate Judge E. Thomas Boyle on April 30, 2002 (the "Report"), concerning professional fee applications for services rendered in the above captioned case. The Report AS MODIFIED BELOW, IS ADOPTED as an Order of this Court.

The receiver and his professionals request fees in the amount of $1,770,872.66 and expenses of $89,774.99. Magistrate Judge Boyle recommends fees and expenses totaling $638,407.25. (Report at 17.) This Courts Orders that the total amount of fees and expenses to be awarded is $667,445.45.

This Court finds that the total amount of professional fees to be dispersed is $608,143.40. These fees are to be distributed as follows: (i) $66,878.00 to the receiver, Richard Stone; (ii) $304,421.25 to Kaye Scholer, LLP; (iii) $106,692.25 to Deloitte and Touche, LLP; (iv) $113,264.90 to FTI Consulting Inc.; and (v) $16,887.00 to Littman & Miller.

In addition, it is Ordered that reimbursement of expenses be awarded in the

amount of $59,302.05, as follows: (i) $20,281.93 to Richard Stone; (ii) $34,903.89 to Kaye Scholer, LLP; (iii) $1,688.00 to Deloitte and Touche, LLP; (iv) $2,283.15 to FTI Consulting, Inc.; and (v) $145.08 to Littman & Miller.

## BACKGROUND

On February 17, 2000, the Securities and Exchange Commission ("SEC") commenced this action against defendants William Goren ("Goren"), New Age Financial Services, Inc. and New Times Securities Services (collectively "Defendants"). (Compl. ¶ 1.) The SEC alleged that Goren conducted a Ponzi scheme that defrauded hundreds of investors and resulted in losses exceeding $35 million. Pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933, 15 U.S.C. § 77t(b) and 77t(d), and Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), the SEC sought a preliminary and permanent injunction against Defendants as well as disgorgement, prejudgment interest, and civil penalties. (App. for Prelim. Inj.)

On February 18, 2000, this Court granted the SEC's application and issued a "Preliminary Injunction and Order Freezing Assets and Other Relief" (the "Preliminary Injunction Order"). In that Order, this Court found that the appointment of a temporary receiver was necessary to preserve the status quo and liquidate assets to prevent the diminution of their value. (Prelim. Inj. Order at 3.)

The Preliminary Injunction Order appointed Richard Stone ("Stone" or "Receiver") as temporary receiver for the defendants. (Id. at 7.) The clear objective of the Preliminary Injunction Order was to return as much as possible to the investors. Pursuant to this end, Stone was empowered, *inter alia*, to: (1) take and retain immediate possession, custody, and control of all assets, property, books and records of the defendants; (2) secure and protect such assets and property; (3) employ persons to assist him in carrying out his duties, including accountants, attorneys, and experts; (4) acquire and retain all rights and powers which the Corporate Defendants have to manage, control, operate and maintain their business with a view to preventing loss to the public investors; (5) acquire control over Goren's interests in his assets and property; and (6) report his progress to the Court. (Id. at 7–11.) Goren was ordered to prepare an inventory of his personal assets and convey them to the Receiver as requested. (Id.)

With respect to fees and expenses, the Preliminary Injunction Order provided that "[d]efendants shall pay the reasonable costs, fees and expenses of the temporary receiver incurred in connection with the performance of his respective duties ... including ... the reasonable costs, fees and expenses of all persons who may be engaged or employed by the temporary receiver to assist him in carrying out his duties and obligations." (Id. at 11–12.) In order to receive these payments the Receiver was required to make an application to the Court which set forth in reasonable detail the nature of the work performed. (Id. at 8–12.)

Stone proceeded to engage the services of the law firm Kaye Scholer, LLP ("Kaye Scholer"), the accounting firm of Deloitte & Touche, LLP ("Deloitte"), the accounting firm of FTI Consulting, Inc. ("FTI"), and the law firm of Littman & Miller ("Littman"). The Receiver and his professionals eventually expended approximately 10,000 hours (i) ordering Goren's papers, (ii) liquidating several pieces of real estate held individually and in partnerships, including overcoming several legal barriers to the liquidation of that property, (iii) closing Goren's investment businesses, (iv) managing Goren's rental properties and (v)

liquidating various non-real estate assets. The professionals contend that they should also be credited with persuading the Securities Investor Protection Corporation ("SIPC") to initiate a Securities Investor Protection Act ("SIPA") proceeding that eventually recovered approximately $20 million for the aggrieved investors.

Goren provided the initial estimate of his estate's value at $9 million. However, it was apparent to the Receiver "very early on that this estate was not worth nearly as much as Goren estimated." (Stone Cert. dated May 13, 2003, at 14.) Therefore, the professionals were fully cognizant throughout the receivership that conservation of the estate's resources was of the utmost importance and that the professional fees incurred should be kept to a minimum. Indeed, the estate eventually yielded only $2,053,771.18. (Stone App. dated Oct. 1, 2002, Ex. C.)

Nearly half of the funds recovered ($900,491.86) were from the sale of nine pieces of real property. (Id.) Six other real property interests were either abandoned or foreclosed. The only notable legal questions the Receiver was forced to confront in the sale of properties were the settlement of a tenuous claim to Goren's Florida property, the unwinding of five straightforward partnerships holding five parcels of real estate, the negotiation of a discontinuance of foreclosure, and the vacation of several liens filed in violation of this Court's Preliminary Injunction Order. An insurance claim for vandalism to Goren's primary residence was farmed out to a third law firm on a contingency fee basis. (Kaye Scholer App. dated Oct. 2, 2002, at 22, note 1.) The sources of the remaining funds included the sale of jewelry, automobiles, fur coats, an investment in the adult entertainment industry, life insurance policies, internet stock, a 401(k) distribution, and Knicks season tickets. (Stone App. dated October 1, 2002, Ex. C.)

By an order dated December 26, 2002, this Court referred the professionals' fee applications to United States Magistrate Judge Boyle to recommend as to the reasonableness of the fees requested based on the work involved, the amounts recovered, the fairness of the rates charged, the time spent and the need therefore. On December 30, 2002, Judge Boyle issued an order to show cause why the fees in this case should not be calculated pursuant to the United States Court of Appeals for the Second Circuit's decision in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir.2000) (adopting percentage of recovery method for determining reasonable attorneys' fees). The SEC, the Receiver, and his agents opposed the use of the percentage of recovery method arguing that *Goldberger* was inapposite because the instant action was not a common fund litigation and that the Receiver would not have accepted the receivership had he known he would be compensated on a percentage of recovery basis.

In his Report, Magistrate Judge Boyle recommends adoption of the percentage theory of recovery in this matter and payment to the professionals of a 27% share of the funds recovered through liquidation. (Report at 8—9.) Magistrate Judge Boyle verified the reasonableness of this 27% share by applying a lodestar cross check which computed the fees by multiplying an appropriate hourly rate for each professional by the reasonable number of hours required to complete their work. (Report 16—19.)

The various professionals and the SEC now object to Magistrate Judge Boyle's recommendations and request payment of the full fee applications previously submitted, in the amount of approximately $1,800,000.

## DISCUSSION

### A. Legal Standard

District courts must scrutinize fee applications to ensure that they are reasonable. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Furthermore, courts must exercise discretion to avoid even the appearance of a windfall. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir.1974). Courts typically use one of two methods to determine a reasonable attorneys' fee: (i) the percentage of recovery method or (ii) the lodestar method. *Goldberger,* 209 F.3d at 47. However, it bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is reasonable under the circumstances. *See Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir. 1988).

■ Under the percentage of recovery method, the court awards fees as a percentage of the funds generated by attorneys' efforts. *Id.* at 47. To determine the proper percentage courts examine the traditional criteria: (1) the time expended and the expertise of counsel; (2) the magnitude and complexities of the litigation; (3) the risks involved in the litigation; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Id.* (citing *Brown,* 838 F.2d 451 at 455).

■ Under the lodestar method, the district court "scrutinizes the fee petition to ascertain the number of hours reasonably billed and then multiplies that figure by an appropriate hourly rate." *Goldberger,* 209 F.3d at 47 (citing *Savoie v. Merchants Bank,* 166 F.3d 456, 460 (2d Cir. 1999)). Once this initial fee calculation has been made, the court may use its discretion to adjust the award by considering the same traditional criteria employed in the percentage of recovery method. *Goldberger,* 209 F.3d at 47, 50.

■ Magistrate Judge Boyle's Report recommends the adoption of the percentage of recovery method and the use of "the lodestar documentation as a 'cross-check' on the reasonableness of the requested percentage." (Report at 8.) The Report likens the attorneys' roles in this receivership to those of litigators in common fund cases, noting that in both instances the injured parties hold low individual stakes in the outcome, the injured parties typically fail to file objections, and the defendant lacks an interest in how the fund is divided. (*Id.* at 7–8.) Magistrate Judge Boyle further notes a trend within the Second Circuit to award fees in common fund cases in accordance with the percentage of recovery method. *Id.* at 8 (citing *In re Dreyfus Aggressive Growth Mutual Fund Litig.,* No. 98–4318, 2001 WL 709262, at 4 (S.D.N.Y. June 22, 2001)).

The professionals argue that the percentage of recovery method is only applicable in common fund cases and should not be applied here. A common fund is a system in which the plaintiff and his attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of the litigation, including attorney's fees. *Black's Law Dictionary* (5th ed.1999). While a receivership technically fits within the definition of a "common fund," and the similarities listed in the Report are present, this Court does not believe that the percentage of recovery method should be the principal basis for the fee determination in this case.

The instant receivership was somewhat different than a common-fund litigation and has certain features that are similar to a trusteeship in a bankruptcy proceeding. *See In re Miniscribe Corporation,* 309 F.3d 1234, 1243, (10th Cir.2002) (noting that a receiver is the non-bankrutpcy coun-

terpart of a trustee in bankruptcy). Specifically, Stone and his professionals did not engage in complex and speculative litigation, as in a typical common-fund case, but merely executed the Court's orders to conserve and liquidate Goren's assets. This consisted primarily of the sale of real estate, the unwinding of associated partnerships, and the sale of several other investments and personal assets. The execution of the Court's orders entailed costs to the receiver and his professionals that do not necessarily correspond to the percentages traditionally employed when the percentage of recovery method is applied.

Moreover, the Preliminary Injunction Order instructed Stone to set "forth in reasonable detail the nature of his costs, fees, and expenses." (Prelim. Inj. Order at 8.) This strongly suggested that these detailed entries would be the principal guide used to determine the appropriate fee. This Court believes it would be inconsistent and inequitable now to determine the fee applications based on the percentage of recovery method. While use of the percentage of recovery method may be appropriate in other receiverships, the Court finds that the lodestar method is better suited to the determination of fees in this particular case.

Accordingly, the Court will not rely on the use of the percentage of recovery method as the principal basis for the fee determination in this case. Nonetheless, the Court believes that the amount recovered is a factor to be considered in determining a reasonable fee. As the Tenth Circuit stated in awarding a bankruptcy trustee's fee, "[w]hile it cannot be denied that results obtained is a factor to be considered in assessing the reasonableness of trustee compensation ... we believe this is better considered as merely one of the ... criteria for determining the multiplier, if any, to be applied to the lodestar amount, rather than the *sine qua non* of

the reasonableness calculation." *In re Miniscribe Corporation,* 309 F.3d 1234, 1243, (10th Cir.2002).

## B. Lodestar Application

To compute the lodestar, the district court "scrutinizes the fee petition to ascertain the number of hours reasonably billed and then multiples that figure by an appropriate hourly rate." *Goldberger,* 209 F.3d at 47.

### 1. Appropriate Hourly Rate

It is well settled that the appropriate hourly rate for attorneys' fees is the rate "prevailing in the community *for similar services* by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (emphasis added). Not long before the bulk of the work in this case was performed, courts in this district employed, and the Second Circuit upheld, rates of $200 per hour for partners, $135 per hour for associates and $50 per hour for paralegals. *White v. White Rose Food,* 86 F.Supp.2d 77, 79 (E.D.N.Y. 2000) (citing *Savino v. Computer Credit., Inc.,* 164 F.3d 81, 87 (2d Cir.1998)). These rates were recently confirmed by Judge Nicholas Garaufis, who has recently held that "the prevalent rate in this district is in the range of $200 and $250 for partners and between $100 to $200 for junior and senior associates." *Rotella v. Bd. of Education,* 2002 WL 59106, *2, 2002 U.S. Dist. LEXIS 507 at *6 (E.D.N.Y.2002). Judge Garaufis also recognized that $50 is an appropriate rate for paralegals. *Id.* at *4, 2002 U.S. Dist. LEXIS 507, *13. The Court finds those rates appropriate in the instant case.

In the instant application, this Court agrees with Magistrate Judge Boyle's finding that the appropriate hourly fee for the Receiver's services is $175 per hour. (Report at 17.) A fee somewhat

lower than a typical partner-level attorneys' fee is warranted because the Receiver in this proceeding was called upon to act primarily as an administrator. The Receiver exercised his privilege to hire additional attorneys and professionals whenever necessary. Moreover, many of Stone's hours were not billed for complex legal work but for activities such as travel, responding to investors' questions, hiring other attorneys to perform legal work, and reviewing the work of other attorneys. (Stone App. dated Oct. 1, 2002, at 1, 11.)

Magistrate Judge Boyle applied a blended hourly rate of $150 to all hours billed by Kaye Scholer's partners, associates, and paraprofessionals. *Id.* The use of a blended rate risks under- or over-compensating these professionals for their efforts. This Court prefers to pay those individuals at their appropriate hourly rates.

■ While attorneys practicing in specialized fields frequently bill at higher rates, the tasks Kaye Scholer was called upon to execute were primarily administrative tasks including the marketing of real estate and other assets. Many of the hours billed by Kaye Scholer did not require the type of legal expertise which would justify a premium rate. For example, vast amounts of time were expended answering investors questions, performing title searches, preparing sale agreements, and marketing the various assets.

Because Kaye Scholer did not specifically disclose the positions held by most of the 62 employees that worked on this receivership, the Court has reasonably determined that the 43 employees billing at $250 per hour or less were paralegals, the 5 billing between $250 and $340 per hour or less were associates, and the 14 billing between $355 and $529 were partners. (See Kaye Scholer App. dated Oct. 2, 2002, Ex. A (specifying hours and billing rates for each of the 62 employees); see Kaye Scholer Obj. dated May 15, 2003, Ex. A at 36, (stating that 54% of hours were billed by paralegals).)

This Court finds that the appropriate rates for the accounting services provided by Deloitte and FTI in this case are commensurate with attorney's rates. The reasonable rate for the services provided by partners in this case is $200 per hour. Employees deemed "managers", "senior managers", or "consultants" performed tasks in this case such as the preparation of reports to be submitted to this Court, interaction with the attorneys in this case, the preparation of various forms of financial data, and the supervision of paraprofessionals. (Deloitte App. dated January 2, 2002; FTI App. dated October 2, 2002, Ex. D.) Such tasks require a level of training and experience similar to that of a legal associate and thus $135 is an appropriate rate in this case. Employees deemed "senior associate" and "paraprofessional" performed tasks in this case such as the preparation of schedules, sorting and categorizing information, answering telephone calls, and making assorted administrative calls. (Id.) These tasks required a similar level of training and experience to those performed by legal paraprofessionals and thus $50 per hour is an appropriate hourly rate in this case. Employees deemed "assistant" or "administrative" performed the type of tasks suggestive by their titles and, in this case, $45 per hour is an appropriate rate for their labor.

The appropriate hourly rate for the legal services of Littman is the rate at which they billed, which was within the range of rates typically charged for such services within this district.

### 2. Hours Reasonably Expended

Hours that are excessive, redundant, or otherwise unnecessary are not "reasonably expended" and should be excluded from the initial fee calculation. *Hensley,* 461

U.S. at 434, 103 S.Ct. 1933. Such instances may arise when cases are overstaffed or where counsel is inexperienced or unskilled. *Id.* This Court's thorough review of the contemporaneous billing records presented in the fee applications reveal numerous instances of hours that should be excluded.

*a. Redundant and Excessive Work*

■ Magistrate Judge Boyle noted in his report that "[b]ased on the affidavits and the time records submitted, it appears that services rendered were duplicated by more than one, if not all, of the remaining professionals." (Report 10.) Excepting Littman, whose participation was confined to the closing of many of the real estate transactions, the professionals all claimed some involvement in almost all aspects of the liquidation.

In total, nearly 100 persons were employed in this receivership. This includes the Receiver, 62 persons at Kaye Scholer, 9 persons at Deloitte, 19 at FTI, an unspecified number of attorneys at Littman, and an unspecified number of attorneys at the firm hired on a contingency basis to litigate Goren's insurance claim for vandalism to his primary residence.[1] (Kaye Scholer App. dated Oct. 2, 2002, Ex. A; Deloitte App. dated January 15, 2002, at 16; FTI App. dated October 2, 2002, Ex. C.) In addition, the receivership employed at least two professional appraisers, several real estate brokers, and a property manager.

While many of these employees only billed a handful of hours, this Court believes that the engagement of so many individuals resulted in excessive and unnecessary billings. Innumerable hours were apparently billed just to communications amongst the professionals. The overstaffing resulted in an accretion of hours billed, but not in meaningful progress towards the receivership's goals.[2]

The sale of Goren's jewelry is one clear example of duplication of work. These sales, which raised $207,000, should have been a relatively simple task. The jewelry in this case was easily salable and unencumbered. Ultimately, 37 of 38 articles were purchased by a well-known, nearby auction house at a 20% discount to their fair value.[3]

---

1. The Court notes that the SEC rejected this Court's proposal to appoint an experienced fiduciary who had in a prior case before this Court settled, collected, accounted for and dispersed to beneficiaries of a pension fund approximately $5,500,000, which had been declared by the Department of Labor to be "worthless". *In re Trustees of the Local 231–613–614 Welfare Fund,* (94–CV–3685). While the Court recognizes that each case is different, the fiduciary in that prior case worked with only two associates and paralegals over a nine-year period and requested only $850,000 (15%) in fees and disbursements under the lodestar approach. This prior case is in stark contrast to the army of professionals (an attorney receiver, three law firms and two accounting firms) hired in this case. The prior case evidences the savings that are attainable when services are not duplicated.

2. It is undisputed that the Receiver and his professionals are highly regarded practitioners in securities law and the restructuring of large corporations. Many of them have impressive credentials. Stone, for example, has worked on several major securities litigations, such as *In re Bennett Funding; In re Amazon.com; In re Laidlaw Bondholders; In re Manhattan Funds Securities;* and *Potchin et al. v. The Prudential Home Mortgage Company, Inc.* (Stone Obj. at 2, 5.) However, most of the services required in this receivership had little to do with complex securities law. Most of the work related to collecting rents, the auctioning of easily marketable personal property, and the sale of real property. Thus, while the professionals are experienced in their respective fields, their backgrounds did not necessarily assist them in performing the tasks in this case efficiently.

3. The remaining piece of jewelry, a Tiffany

The number of attorneys' hours expended in this effort can not be reconciled to the final result. Neither the Receiver nor Kaye Scholer offers a breakout of their hours to explain to the Court how much time was expended in this effort. And because of "lumped" time entries it is impossible for this Court to calculate the precise amount of time by examining the fee applications. (See, e.g., Kaye Scholer App. dated October 2, 2002, Ex. B at 9, 10, 13, 15, 17, 19, 20, 21, 22, 23, 24, 25, 26, 28, 31, 32, 33, 35, 38, 39, 43, 45, 46, 47, 48, 50, 51, 52, 53, 55, 56.) However, it is clear that the hours billed were significantly higher than what was reasonably required.

The record shows that a significant amount of time was expended between March and July, when most of the jewelry was ultimately sold, by Stone and the attorneys at Kaye Scholer simply apprising each other of the slow-going effort. (Id.) The time sheets show that no less than five attorneys, including Stone, billed time on the sales of these unencumbered assets. (Id.) This high number of hours billed to the sale of the jewelry appears to arise from the involvement of an excessive number of people working on this project.

The sale of the jewelry is also representative of the overkill in staffing and hours that apply to the sale of Goren's real estate interests. On this project, Stone, Kaye Scholer, Littman and Deloitte were all involved. Deloitte's "General sale of properties" occupied its employees for one hour per day over a period of many weeks. In his affidavit Scott Friedland, an accountant at Deloitte and later at FTI, describes this activity as including, "[coordination] of real estate broker activity." (Friedland Aff.,

dated May 15, 2003, at 2.) At the same time, Kaye Scholer produced detailed billing records of discussions with brokers regarding specific properties.

In addition, Stone traveled from Palm Beach to New York to inspect the individual properties before their sale. While it may be desirable that the Receiver assure himself that his professionals have secured a fair price, the sharing of responsibilities by such a large number of professionals makes it impossible for the Court to determine precisely which parties performed what services and whether each of the services rendered were necessary.[4] Where, as in the instant case, the total number of hours expended strikes the Court as greatly out of proportion to the final results achieved, namely the sale of nine properties without any substantial litigation, the mere affirmation of the Receiver and his professionals that there was no duplication of effort is insufficient to overcome this Court's substantial doubts.

There also appears to be duplication of effort in regards to answering questions from investors. Stone, Kaye Scholer, and the accountants all expended considerable hours answering questions from investors. Responsibility for responding to investor inquiries could, and should, have been centralized at the beginning of the receivership and limited so as to reduce duplication of effort. In addition, the cost of this work could have been pared by having less experienced personnel responding to the investors' inquiries. Responding to the questions of the victims in this case was an important function of the Receiver, but he was not required to undertake it himself.

---

diamond and pearl necklace appraised at $9,000, was sold at a similar discount to Stone's residential neighbor in Palm Beach. Stone apparently did not charge the receivership for his time in arranging the sale of this item.

4. The Court also notes the concern for duplication of efforts is particularly true here, since the ultimate approval and responsibility for the sale or abandonment of the properties was placed upon this Court.

Where it was evident from early on in this proceeding that the total recovery would be limited, the duty to conserve what remained of the victims' savings became especially acute.

Stone and Kaye Scholer also billed a significant number of hours for their work with SIPC, and some of these hours are redundant. This Court disagrees with Magistrate Judge Boyle that all work on the SIPA proceeding was unnecessary. Indeed, the proceeding ultimately resulted in an additional $20 million in recoveries for New Age investors and thus was clearly beneficial.[5] (Kaye Scholer Obj. dated May 15, 2003, at 21.) It also appears that Stone may have played an important role in persuading SIPC to bring the action. (SEC Obj. dated May 14, 2003, at 4.) The time billed for this may therefore be credited.

Once initiated, however, the SIPA proceeding had its own court appointed trustee, James Giddens, who employed a different law firm, Hughes, Hubbard and Reed, LLP, as assistants. Yet, even after this Court authorized the consolidation of the New Age and New Times estates in the SIPA proceeding on December 4, 2000, Stone continued to bill for SIPC related work throughout 2001 and 2002. (Stone App. at 10, 11, 13, 14.) That work is apparently duplicative and Stone should not be credited for it.

### b. Unnecessary Work

A great deal of unnecessary work was also billed by the Receiver and his professionals in this case. As indicated above, nearly 50% of the total recovery was from the sale of nine pieces of real property, which was accomplished with the legal assistance of Littman and did not include any substantial litigation. The remaining assets were easily marketable. Nonetheless, the professionals expended nearly 10,000 hours and have requested approximately $1.8 million in fees.

An obvious example of unnecessary work is Kaye Scholer's efforts to index Goren's papers. While Goren's fraud was elaborate and his records disorganized, this comprehensive indexing project required over 1,000 hours of paralegal labor.[6] While some amount of work was obviously required to locate relevant papers, an index so comprehensive was not necessary to achieve the primary goal of returning as much as possible to the investors. This is especially true since the professionals knew "very early on" that the estate was worth far less than the investors had lost.

### c. Insufficient Detail

■ A fee application must be supported by contemporaneous time records which describe with specificity the work done. *New York State Assoc. for Retarded Children, Inc v. Carey*, 711 F.2d 1136, 1148 (2d Cir.1983). The burden is on counsel to "keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir.1987) (rejecting as inadequate time records with two and three word descriptions for an entire

---

**5.** *SEC v. Goren*, 206 F.Supp.2d 344 (E.D.N.Y. 2002).

**6.** Kaye Scholer employees Adams, Coviello, and Jean–Louis, expended all or substantially all of their combined 790.4 billed hours coding documents and entering them into a database. Kaye Scholer employee Presseau spent most of his 304.0 billed hours either coding documents or "cataloguing and indexing mail and creating labels". (Kaye Scholer App. Ex. A, B.)

day's work such as "reviewed docs." And "clients re: testimony"). This is especially true in this case because the Preliminary Injunction Order required that the Receiver would provide reasonable detail regarding the nature of his costs, fees, and expenses. (Prelim. Inj. Order at 8.)

In the instant case, some of the fee applications suffer from vague descriptions that constrain the Court's ability to conduct a meaningful review. For example, Stone's application for $284,231.50 is supplemented by a mere 16 pages of contemporaneous time accounts. The Court's review revealed that many of Stone's entries lack reasonable detail, for example,

@ $297.5 per hour

| | | |
|---|---|---|
| 3/14/00 | Memo (4); customer calls (3) securities liquidation (1); warrant sales (1) 9.0 hours = $2677.50 | |
| 3/27/00 | Review litigation (3.5) 3.5 hours = $1041.25 | |
| 4/28/00 | Calls to investors re: meeting (6) 6.0 hours = $1785 | |
| 6/15/00 | Real estate issues (4) 4.0 hours = $1190 | |
| 6/2700 | Customer calls re: SIPC (3.00) 3.0 = $892.5 | |
| 7/9/00 | SIPC research (8) 8.0 = $2400 | |
| 7/11/00 | SIPC research (3) 3.0 = $892.5 | |
| 11/20/00 | Research (2) 2.0 = $595 | |

Though much more detailed than Stone's time-records, the Deloitte fee application also lacks adequate detail. Inadequate entries include "General Property Management", 166.0 hours for $48,970; "General Sale of Properties", 33.75 hours for $9,956; and "Make calls, draft letters and provide research related to sale / maintenance of properties", 42.75 hours for $7,481.25. None of these billings offer sufficient detail to permit a meaningful review. While the lack of clarity in Deloitte's time-records complicates this Court's ability to review the fee application, the records as a whole provided a basis for the Court to determine the nature of the work performed. Accordingly, the Deloitte's billable hours will not be reduced for insufficient detail.

The applications of Kaye Scholer and FTI contain the greatest amount of detail and were generally well prepared. A summary of all the activities performed by these firms is provided in the beginning of the application with a descriptive chronological log explaining each service rendered. Phone calls and meetings detail those who were present and what was discussed. All research entries detail the matter being researched. As a result, Kaye Scholer and FTI will not have anything deducted from their application as a result of insufficient detail.

### d. Uncorroborated Activities

Attorneys should not be fully compensated where their various billing records fail to corroborate that claimed meetings or calls with each other took place. *See Goldberger*, 209 F.3d at 46. While not the basis for a significant reduction in this case, the instant applications contain several uncorroborated claims. For example, 5/3/00

| | |
|---|---|
| Stone: | Meeting SH [shareholders] in White Plains (10.00) |
| Kaye Scholer: | Attended and participated in Investor Meeting (5.00) (Kress) |
| Kaye Scholer: | Attend meeting of investors at Westchester County Center (5 hours) Davidson) |

### C. Appropriate Reduction

Based on the above analysis, it is clear that the requested fee applications must be reduced. "As the amount of an award is

within the discretion of the district court, so is the amount of any reduction." *United States Football League v. National Football League,* 887 F.2d 408, 415 (2d Cir.1989). The mere fact that the professionals in this case worked and documented a significant number of hours is insufficient to warrant compensation for all of them. As United States District Judge Milton Pollock has noted, "the requirement of time records [is] not an invitation for the distortion of the value of the required services or the proliferation of unnecessary unwarranted activity in the light of the overall objective requirements of the case." *Browning v. Peyton* 123 F.R.D. 75 (S.D.N.Y.1988).

▮ Where fee applications are voluminous "courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application. These courts have endorsed percentage cuts as a practical means of trimming fat from a fee application." *Carey,* 711 F.2d at 1146 (employing percentage reduction of hours where application was for more than 11,000 hours). Courts have routinely reduced fees computed under lodestar methodology by deducting a percentage from the number of hours reasonably billed by or by deducting a lump sum. *See e.g. id.* (thirty percent reduction due to, inter alia, vague entries); *DeVito v. Hempstead China Shop, Inc.* 831 F.Supp. 1037, 1045 (forty percent reduction due to duplication of efforts, insufficient descriptions, unnecessary work, disallowance of travel time, and the overall sum achieved for plaintiffs.); *Sec. and Exch. Comm'n v. Mobley,* 2000 WL 1702024, 2000 U.S. Dist. Lexis 16452 (S.D.N.Y.2000) (lump sum reduction due to inefficiently lumped time entries).

This Court finds that the fee applications should be reduced because the fee applications included entries that were redundant, excessive, unnecessary, and lacking in sufficient detail. Furthermore, this Court is especially concerned by the threatened appearance of a windfall, an important public policy concern. *Grinnell,* 495 F.2d at 469. A recent article in the "Legal Times" on the subject of disgorgement cases noted that "the SEC's handling of [them] has been the subject of considerable criticism from congressional investigators over the past decade." Otis Bilodeau, *The Pursuit is Easier Than the Catch,* Legal Times, May 19, 2003, at National 1. The article cites specifically the [General Accounting Office's] criticism of a receivership where the fees equaled 54% of the common fund, considerably less than the 85% requested here. *Id.*

In the instant case, the contemporaneous time accounts memorialize more than 10,000 hours and thus, as in *Carey,* a percentage reduction is appropriate. This Court finds that the hours billed by Stone, Kaye Scholer, Deloitte, and FTI are to be reduced by 30% to reflect the inefficiency with which their tasks were performed. As outlined above, many of the hours billed were redundant, excessive, and/or unnecessary.

The hours billed by Stone are reduced by an additional 30%, or 60% overall, due to the lack of detail in his fee application. Many of his entries were ambiguous and prepared in such a manner that made it impossible to conduct a meaningful review. Morever, Stone's primary role appears to have been as a supervisor for the many experienced professionals he retained and therefore his application appears to be the most duplicative of all the fee applications. The hours billed by Littman & Miller were reasonable and their application thoroughly documented and thus they will not be reduced.

These reductions bring each applicant's fee in-line with what the Court thinks are the reasonable fees in this receivership.

Moreover, considering the percentage of recovery as a factor, the total awarded fees of $608,143.40, is approximately 29.6% of the total recovery, commensurate to a reasonable contingent fee recovery in a common fund case.

The awarded fees, calculated in light of these reductions, are set forth in Exhibit A.

## D. Expenses

"Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation' of those clients." *Miltland Raleigh–Durham v. Myers,* 840 F.Supp. 235, 239 (S.D.N.Y. 1993). However, expenses which are part of the attorneys' ordinary overhead are not to be reimbursed. *See New York State Nat'l Org. for Women v. Terry* 737 F.Supp. 1350, 1363 (S.D.N.Y.1990).

Stone, in an itemized schedule, applied for $27,018.74 in expenses incurred during the receivership. Magistrate Judge Boyle noted that Stone provided no explanation as to why his travel from Palm Beach to New York City was required and thus recommended that his hotel and airfare costs be denied. (Report at 21.) In his Certification dated May 13, 2003, Stone notes several reasons why his presence was required in New York, including meetings with Goren, inspection of Goren's place of business and assets, and attendance at various hearings. (Stone Cert. at 28.) This Court finds those reasons justify Stone's travel, but not all of his travel expenses.

For example, on numerous occasions Stone stayed in Manhattan when the purpose of his visit was to attend meetings or visit sites located in Westchester or on Long Island. Thus, a $2,000 reduction in hotel expenses from $9,746.93 to $7,746.93 is warranted. Furthermore, in many cases Stone's airfare for flights from Palm Beach to New York cost up to $1,200. At a more reasonable $350 per trip, his airfare expense should not have exceeded $7,000. Thus, Stone's airfare expenses will be reduced $4,736.81 from $11,736.81 to $7,000. Accounting for these reductions, Stone should be reimbursed $15,535 for his necessary expenses.

Kaye Scholer, in an itemized schedule, applied for $52,952.74 in expenses incurred during the receivership. Most of these expenses were reasonable, necessary, and not overhead and they should be reimbursed. Some, however, are not. For example, computerized research "is merely a substitute for an attorney's time that is compensable under an application for attorney's fees and is not a separately taxable cost." *Arthur Kaplan Co., Inc. v. Panaria Int'l.,* Inc. 96 Civ. 7973 (S.D.N.Y 1999) (citing *Untied States v. Merritt Meridian Construction Co.,* 95 F.3d 153, 173 (2d Cir.1996)) *aff'd* 205 F.3d 1321, 2000 WL 227424 (2d Cir.2000). Thus, charges of $18,048.85 for Lexis and Westlaw will not be paid. Accounting for this reduction, Kaye Scholer will be reimbursed for expenses of $34,903.89.

Deloitte, without the submission of an itemized schedule, seeks reimbursement of $3,376.00 in expenses. Magistrate Judge Boyle correctly noted that this application for expenses lacks sufficient detail to permit the Court to determine whether the expenses were reasonable and necessary. (Report at 20.) In recognition that there must have been some amount of reasonable expenses for mail, phone, and transportation, the requested sum is reduced by 50% and this court grants Deloitte $1,688.00 in reasonable expenses.

FTI and Littman, in itemized schedules, applied for reimbursement of expenses of $2,283.15 and $145.08, respectively. This

Court agrees with Magistrate Judge Boyle's finding that these expenses appear to be reasonable and necessary to the receivership and thus both applications will be granted in full.

## CONCLUSION

Applications for fees and expenses are hereby granted in conformance with the findings set on Ex. A.

SO ORDERED.

### Exhibit A

**Fees**

| Firm | Position | Requested Hours | Reduction | Credited Hours | Reasonable Hourly Rate | Reasonable Fee |
|---|---|---|---|---|---|---|
| Richard Stone | Receiver | 955.4 | 60% | 382.2 | $ 175 | $ 66,878.00 |
| Kaye Scholer | Partner | 225.3 | 30% | 157.7 | $ 200 | $ 31,540.60 |
| | Associate | 1,755.9 | 30% | 1,229.1 | $ 135 | $ 165,932.55 |
| | Paraprofessional | 2,306.5 | 30% | 1,614.6 | $ 50 | $ 80,727.50 |
| | Word processing | 832.4 | 30% | 582.7 | $ 45 | $ 26,220.60 |
| | Total | 5,120.1 | 30% | 3,584.1 | | $ 304,421.25 |
| Deloitte | Partner | 17.3 | 30% | 12.1 | $ 200 | $ 2,422.00 |
| | Senior Manager | 627.0 | 30% | 438.9 | $ 135 | $ 59,251.50 |
| | Senior Associate | 961.8 | 30% | 673.3 | $ 50 | $ 33,663.00 |
| | Assistant | 22.0 | 30% | 15.4 | $ 45 | $ 693.00 |
| | Administrative | 338.5 | 30% | 237.0 | $ 45 | $ 10,662.75 |
| | Total | 1,966.6 | 30% | 1,376.6 | | $ 106,692.25 |
| FTI | Managing Director | 5.7 | 30% | 4.0 | $ 200 | $ 798.00 |
| | Manager | 705.7 | 30% | 494.0 | $ 135 | $ 66,688.65 |
| | Consultant | 177.0 | 30% | 123.9 | $ 135 | $ 16,726.50 |
| | Paraprofessional | 810.7 | 30% | 567.5 | $ 50 | $ 28,374.50 |
| | Administrative | 21.5 | 30% | 15.1 | $ 45 | $ 677.25 |
| | Total | 1,720.6 | 30% | 1,204.4 | | $ 113,264.90 |
| Littman & Miller | All personnel involved in action | 86.6 | N/A | 86.6 | $ 195 | $ 16,887.00 |
| **Total fees** | | **9,849.3** | **33%** | **6,633.9** | **N/A** | **$ 608,143.40** |

**Expenses**

| Firm | Requested Costs | Reduction | Granted Costs |
|---|---|---|---|
| Richard Stone | $ 27,018.74 | $ 6,736.81 | $ 20,281.93 |
| Kaye Scholer | $ 52,952.74 | $ 18,048.85 | $ 34,903.89 |
| Deloitte | $ 3,376.00 | $ 1,688.00 | $ 1,688.00 |
| FTI | $ 2,283.15 | $ - | $ 2,283.15 |
| Littman & Miller | $ 145.08 | $ - | $ 145.08 |
| **Total expenses** | | | **$ 59,302.05** |

**Total fees and expenses**     **$ 667,445.45**