450 F.3d 91
 James McDONALD, Individually and on behalf of others similarly situated, Margaret PRENDERGAST, as Executrix of the Estate of James McDonald, Plaintiffs-Appellees, Cross-Appellants,
v.
PENSION PLAN OF THE NYSA-ILA PENSION TRUST FUND, and Board of Trustees of the Pension Plan of the NYSA-ILA, in their Official and Personal Capacities, Defendants-Appellants, Cross-Appellees.
 Docket No. 05-1435-cv(L).
 Docket No. 05-1630-cv(CON).
 Docket No. 05-1749-cv(XAP).
 Docket No. 05-4140-cv(CON).
 Docket No. 05-4288-cv(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: March 9, 2006.
 Decided: June 6, 2006.
 
 COPYRIGHT MATERIAL OMITTED Nicholas G. Maglaras, The Lambos Firm, New York, N.Y. (Donato Caruso, The Lambos Firm, New York, NY; Thomas W. Gleason, Ernest L. Mathews, Jr., Gleason & Mathews, P.C., New York, NY, on the brief), for Defendants-Appellants, Cross-Appellees.
 Edgar Pauk, New York, NY, for Plaintiff-Appellee, Cross-Appellant.
 Before CALABRESI, CABRANES and WESLEY, Circuit Judges.
 PER CURIAM.
 
 
 1
 After decisions by two different district court judges and a published opinion by this Court, this case, involving the computation of years of service under the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"), reaches us again with three questions remaining.[1] First, did the district court correctly conclude that all of former-longshoreman James McDonald's pre-ERISA years of service in excess of 400 hours should be carried over to the post-ERISA period to establish pension eligibility, and further, that no modification of the pension plan ("the Plan") of the NYSA-ILA Pension Trust Fund was necessary? Second, did the district court exceed its discretion, or otherwise err, in its first award of attorney's fees? Finally, did the district court err in the second fee award following remand from this Court when it determined the reasonable hourly rate of McDonald's lawyer, Edgar Pauk, using a "blended hourly rate?" We answer the first and third questions in the affirmative and with respect to the second question, we conclude that the district court did not err in its first fee award. Accordingly, we AFFIRM the district court's March 7, 2005 Order and Judgment as to the merits of the ERISA case and the first fee award entered on September 6, 2002, and we VACATE the second attorney's fee award, entered July 14, 2005, and REMAND for recalculation of that award.
 
 Discussion
 
 The Merits
 
 
 2
 McDonald sued the Pension Plan of the NYSA-ILA Pension Trust Fund and its Trustees (collectively, "PTF") in August of 1999, based on a belief that "his pension calculations failed to reflect 13 years during which he had accrued benefits." McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 320 F.3d 151, 153 (2d Cir.2003) ("McDonald IV"). This Court vindicated McDonald's belief by affirming a decision of the district court (Buchwald, J.), which invalidated "a Plan provision that permitted the PTF to disregard years of service rendered prior to a break in service that occurred before the passage of [ERISA]." McDonald IV, 320 F.3d at 153 (citing 29 U.S.C. §§ 1001 et seq.). Specifically, we agreed with the district court that "ERISA § 204, 29 U.S.C. § 1054, trumps the Plan's break-in-service provision."[2] Id. (citing McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 153 F.Supp.2d 268, 280-81 (S.D.N.Y.2001) ("McDonald I")). Nevertheless, we remanded the case for further fact finding based on PTF's argument that, had it known its break-in-service provision would be invalidated, the Plan would not have defined a "year of service" as service in excess of 400 hours per year, but rather would have used a higher minimum number, such as the 1000-hour description of a "year of service" under ERISA § 202(a)(3)(A), 29 U.S.C. § 1052(a)(3)(A). See McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054(PKC), 2004 WL 2050166, at *2 (S.D.N.Y. Aug.6, 2004) ("McDonald V"). As we said in McDonald IV: "We are concerned . . . with the effects of nullifying the Plan's break-in-service provision with regard to pre-ERISA benefit accrual and leaving the Plan's 400-hour `year of credited service' definition to stand on its own, when under the terms of ERISA itself the PTF was not required to recognize any of McDonald's pre-1973 service." 320 F.3d at 160-61, quoted in McDonald V, 2004 WL 2050166, at *2. Although PTF's argument gave this Court pause sufficient to require a remand based on the record then before us, and despite the fact that we had otherwise affirmed McDonald's victory in the district court, we are now confident that had we known in McDonald IV what we now know as a result of facts disclosed on remand in McDonald V, we would not have remanded in the first place. The district court first learned on remand that although the parties had been under the assumption that the 1969 Plan was the Plan that applied to McDonald's pre-ERISA service,[3] there was in fact a 1972 Plan, which the parties do not dispute was the Plan that was in play. See McDonald V, 2004 WL 2050166, at *3.
 
 
 3
 It is the difference between the two Plans that conclusively resolves the issue that troubled us in McDonald IV. The 1969 Plan required a longshoreman, like McDonald, to have worked "a continuous period of not less than twenty-five (25) years." Art. III, § 1(c) of the 1969 Plan (emphasis added). It was the "continuous" service requirement that spawned this litigation by implicating the Plan's break-in-service provision, and thereby excluding thirteen of McDonald's pre-break years of service. Of course, we invalidated the Plan's break-in-service provision in McDonald IV, but as mentioned above, we remanded because of PTF's argument that it would never have defined a year of service as 400 hours in the absence of the break-in-service provision.
 
 
 4
 In contrast to the 1969 Plan, the 1972 Plan added an alternate method of eligibility that did not require "continuous" service, but rather allowed a longshoreman to be eligible when his employment in the industry reached "a total period of twenty-five (25) years" as defined by the Plan, Art. III, § 1(c)(ii) of the 1972 Plan (emphasis added), no matter how long it took to accumulate the twenty-five years. Therefore, while the 1972 Plan still retained the 400-hour definition of a year of service, it provided an alternate way for employees to accumulate the required twenty-five years without implicating the break-in-service provision. PTF takes issue with the district court's reference to the 1972 Plan, because, based on a requirement not relevant here, McDonald could not have satisfied the alternative "total" service provision. But it does not matter that McDonald would not have satisfied the new 1972 alternative provision. The mere existence of an alternative that still defined a year of credited service at 400 hours, yet allowed for eligibility without continuous service and its attendant (and now invalid) break-in-service provision, undercuts completely PTF's argument when it last came before this Court that it would have jettisoned the 400-hour year-of-service definition in the absence of the break-in-service provision.
 
 
 5
 In light of the foregoing, we affirm the district court's application of the PTF plan provisions to McDonald's work history. We also affirm the injunctive relief ordered by the court, which directed PTF to reform its plan provisions in accordance with Judge Buchwald's judgment dated October 1, 2001. Apart from this measure of equitable relief, we agree with the district court that no further modification of the plan is necessary. We have considered the parties' remaining arguments, including PTF's argument pursuant to Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and we find them to be without merit. Accordingly, the district court's March 7, 2005 Order and Judgment on the merits of this appeal (05-1435-cv) is affirmed.
 
 
 The Fee Awards
 
 
 6
 Each of the two district court judges in this case issued attorney's fee awards for work done by Pauk, McDonald's attorney.[4] The first fee award was made by Judge Buchwald following the resolution of initial district court proceedings. See McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054(NRB), 2002 WL 1974054 (S.D.N.Y. Aug.27, 2002) ("McDonald II"). After resolution of the case on remand from this Court, Judge Castel entered the second fee award on July 14, 2005 following a hearing during which the district court discussed its reasoning. We find that the first fee award was not erroneous, but that the district court did err in its calculation of the second fee award.
 
 
 7
 We review an award of attorney's fees for "abuse of discretion." Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 298 (2d Cir.2004). "A district court `abuses' or `exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001) (footnote omitted). Given the district court's inherent institutional advantages in this area, our review of a district court's fee award is highly deferential. See Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47-48 (2d Cir. 2000). In calculating attorney's fee awards, district courts use the lodestar method — hours reasonably expended multiplied by a reasonable hourly rate. See A.R. ex rel. R.V. v. New York City Dept. of Ed., 407 F.3d 65, 79 (2d Cir.2005); see Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1058 (2d Cir.1989). In order to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials. See Chambless, 885 F.2d at 1058; New York State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1147-48 (2d Cir.1983). A district court may exercise its discretion and use a percentage deduction "`as a practical means of trimming fat from a fee application,'" Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir.1998) (quoting Carey, 711 F.2d at 1146), and the Supreme Court has been careful to note that only those hours "reasonably expended" are to be awarded. See Hensley v. Eckerhart, 461 U.S. 424, 434-35, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). A reasonable hourly rate is a rate "in line with . . . prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation." Blum v. Stenson, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); Chambless, 885 F.2d at 1058-59. A district court may also use its knowledge of the relevant market when determining the reasonable hourly rate. See Miele v. New York State Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir.1987).
 
 
 First Fee Award
 
 
 8
 In the first fee award, Judge Buchwald reduced Pauk's hours expended based on three factors: a reduction for work on unsuccessful claims not sufficiently related to the claim on which McDonald ultimately prevailed (25%); a reduction for record-keeping that did not adequately indicate what work was legal and what work was administrative (5%); and a reduction for unnecessarily multiplying the proceedings (5%). On review of the record, we conclude that Judge Buchwald did not err in reducing the fee application's hours by 35%.
 
 
 9
 In calculating the reasonable hourly rate, the district court concluded that $325 per hour would be reasonable for Pauk. McDonald III, 2002 WL 1974054, at *4. In reaching this figure, the district court looked at materials submitted by Pauk in support of his assertion that $425 per hour was a reasonable hourly rate,[5] and cases cited by PTF that the prevailing rate for ERISA practitioners in this Circuit was $300 per hour. The district court made two other findings in reaching the $325-per-hour figure. First, the district court found that "though effective, [Pauk's performance] was less than stellar: He was often inefficient and occasionally vexatious." Id. Second, the district court found it "[o]f great significance" that Pauk was a solo practitioner with lower overhead costs than attorneys associated with large firms.[6] Id. On review of the record, we cannot conclude that the district court erred in setting Pauk's hourly rate at $325 per hour.
 
 
 Second Fee Award
 
 
 10
 The second fee award was made by Judge Castel following remand from this Court. As with the first fee award, we conclude upon a review of the record that the district court did not err in calculating Pauk's reasonably expended hours. The district court reduced Pauk's submitted hours by 35% to account for the hours worked on claims on appeal and remand that were unsuccessful and unrelated to successful claims. However, the district court did err in calculating Pauk's reasonable hourly rate at $390 per hour. It is not that $390 per hour is necessarily incorrect, but it was inappropriate for the district court to use a "blended hourly rate" to reach this figure for a solo practitioner. Judge Castel's blended hourly rate provided a lower rate for work that could only have been done by a junior associate and then blended that rate with the rate assigned to work that, according to the district court's opinion, could only be done by Pauk.
 
 
 11
 A blended rate is "meant to account for the different billing rates of partners and associates by taking an average of the two." Figueroa ex rel. Havre v. Savanar Rest., Inc., 182 F.Supp.2d 339, 341 (S.D.N.Y.2002); see also In re Auction Houses Antitrust Litig., No. 00 Civ. 0648, 2001 WL 210697, at * 1 n. 2 (S.D.N.Y. Feb.26, 2001) ("The blended rate is the firm's total time charges, derived by applying each individual time keeper's hourly rate to his or her hours, divided by the firm's total hours."). The application of a blended hourly rate in calculating the lodestar figure has not been endorsed in our decisions, and it appears never to have been applied to a solo practitioner by any court in this Circuit. See, c.f., SEC v. Goren, 272 F.Supp.2d 202, 208 (E.D.N.Y. 2003) (declining to apply a blended rate because it "risks under — or over-compensating these professionals for their efforts"); Leva v. First Unum Life Ins. Co., No. 96 Civ. 8590(DC), 1999 WL 294802, at *2 (S.D.N.Y. May 11, 1999) (applying blended rate where it was not clear which of multiple billing attorneys performed each task); see also Scholastic, Inc. v. Stouffer, 246 F.Supp.2d 355, 357-58 nn. 5 & 6 (S.D.N.Y.2003) (applying a blended rate in determining the reasonable hourly rate for single attorneys where their individual rates changed during the course of the litigation).
 
 
 12
 PTF invites us to equate the district court's determination of the blended hourly rate to language in some of our earlier cases within this Circuit that suggests that different rates can be set for different litigation tasks. See, e.g., Cohen v. W. Haven Bd. of Police Comm'rs, 638 F.2d 496, 505 (2d Cir.1980); see also Capozzi v. City of Albany, 565 F.Supp. 771, 774-75 (N.D.N.Y.1983) (dividing different litigation tasks into categories like travel time, court appearances, and depositions).[7] We decline PTF's invitation. Setting different hourly rates for different litigation tasks is not the same as using a blended hourly rate. See, e.g., Paulino v. Upper West Side Parking Garage, Inc., No. 96 Civ. 4910(NPC), 1999 WL 325363, at *3 (S.D.N.Y. May 20, 1999) (indicating that different rates can be awarded to litigation tasks such as court appearances, depositions, office time and travel time); Jennette v. City of New York, 800 F.Supp. 1165, 1170 (S.D.N.Y.1992) (in civil rights case, reducing the hourly rate for travel time and for time "reviewing basic civil rights cases"). Here, the district court did not assign different hourly rates for different tasks but rather created the hypothetical "Pauk & Associates" — comprised of one experienced ERISA litigation attorney and a hypothetical group of inexperienced associates — and decided on its own which tasks should have been done by respective members of the hypothetical firm. Cf. Weisberg v. Coastal States Gas Corp., No. 78 Civ. 5942, 1982 WL 1311, at *2 n. 1 (S.D.N.Y. Jun.16, 1982) (declining to parse out attorneys' work based on whether it could have been done by an associate or paralegal, because the attorneys were solo practitioners). The district court "analogize[d]" Pauk's situation to that of a large law firm; some of Pauk's time (for example, his time arguing before this Court or conducting the bench trial) was worth $500 per hour, but some of Pauk's work (for example, the time he spent "researching and cross-moving for summary judgment and opposing summary judgment.") was, according to the district court, work that "could have been delegated to a more junior lawyer at a lower billing rate." There is simply no support for the proposition that a district court can decide what legal tasks could have been done by a hypothetical associate attorney working for or with Pauk in order to calculate a blended hourly rate of $390, especially where, as here, the blended rate applied only to attorney time (not paralegal or secretarial time).
 
 
 13
 We therefore conclude that calculating a reasonable hourly rate using different hourly rates for different litigation tasks is not the same thing as using a "blended hourly rate." Moreover, we conclude that a "blended hourly rate" is not applicable to Pauk's legal work as a solo practitioner. Accordingly, for the reasons set forth above, we affirm the first fee award, and we vacate the second fee award and remand to Judge Castel for recalculation on the basis of a non-blended rate.
 
 Conclusion
 
 14
 The district court's order of March 7, 2005, order and judgment disposing of all claims, and the orders and judgments dated August 27, 2002 and September 6, 2002, respectively, awarding attorney's fees and costs pursuant to FED.R.CIV.P. 54(d), are hereby AFFIRMED, and the district court's judgment awarding attorney's fees and costs pursuant to FED.R.CIV.P. 54(d) dated July 14, 2005, is hereby VACATED and REMANDED to Judge Castel for recalculation.
 
 
 
 Notes:
 
 
 [1]
 An expanded discussion of the facts and legal issues presented in this litigation can be found atMcDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 153 F.Supp.2d 268 (S.D.N.Y.2001) ("McDonald I"). See also McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054(NRB), 2001 WL 1154630 (S.D.N.Y. Oct.1, 2001) ("McDonald II"); McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054(NRB), 2002 WL 1974054 (S.D.N.Y. Aug.27, 2002) ("McDonald III"); McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund, 320 F.3d 151 (2d Cir. 2003) ("McDonald IV"); McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054(PKC), 2004 WL 2050166 (S.D.N.Y. Aug.6, 2004) ("McDonald V"); and McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054(PKC), 2004 WL 2429809 (S.D.N.Y. Oct.20, 2004) ("McDonald VI"). This opinion thus becomes McDonald VII, and if the pattern holds true, there will be at least a McDonald VII.
 
 
 [2]
 The PTF's "break-in-service" provision provided that, if for more than two consecutive years an employee failed to work enough to earn a year of credited service, the PTF could disregard any years of credited service occurring prior to the break in serviceMcDonald IV, 320 F.3d at 157. In McDonald's case, that meant thirteen years of credited service would be disregarded, resulting in a significantly reduced pension. Id. at 154.
 
 
 [3]
 "Under the version of the Plan in effect when [McDonald] ceased working, the PTF was required to look back to the provisions of the Plan as they existed on December 31, 1975, the last pre-ERISA day."McDonald V, 2004 WL 2050166, at *3.
 
 
 [4]
 The attorney's fee questions cover four of the five consolidated appeals and cross-appeals: 05-1630-cv; 05-1749-cv; 05-4140-cv; and 05-4288-cv
 
 
 [5]
 Pauk submitted six affidavits from experienced employment law attorneys from New York and Washington, D.C., stating that Pauk's request for $425 per hour was reasonable. The lowest rate the affidavits suggested would be reasonable for an experienced New York ERISA attorney was $350-360 per hour. The district court also had before it portions of the 1999 edition ofThe Lawyer's Almanac listing New York partners' billing rates (no firm size was mentioned) between the low-$100s per hour and $475 per hour.
 
 
 [6]
 We want to caution, however, that district courts should not treat an attorney's status as a solo practitioner as grounds for an automatic reduction in the reasonable hourly rate. Cases suggest that in determining the relevant "market," a courtmay look to rates charged by those similarly situated, including looking to the rates charged by large — or mediumsized law firms, based on the widely-held premise that a client represented by a medium-sized firm pays less than a client represented by a large firm with higher overhead costs. See, e.g., Chambless, 885 F.2d at 1058-59; Algie v. RCA Global Commc'ns, Inc., 891 F.Supp. 875, 895 (S.D.N.Y.1994). But whether or not the aforementioned premise — that the bigger the firm the higher the attorneys' hourly rates charged — is correct, and even assuming it may be that solo practitioners of equal skill, expertise and reputation, charge less than those at large — or medium-sized firms, courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner. Overhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate. Cf. Miele, 831 F.2d at 409; Blum, 465 U.S. at 892, 895-96, 104 S.Ct. 1541 (rejecting the Solicitor General's suggestion that fees awarded to non-profit legal aid societies be based on a "cost-related standard"). Rather, overhead merely helps account for why some attorneys charge more for their services. Indeed, it may be that in certain niche practice areas, attorneys of the highest "skill, expertise, and reputation" have decided to maintain a solo practice instead of affiliating themselves with a firm. The reasons for doing so may be numerous, including the inherent problems of higher overhead, fee-sharing, and imputed conflicts of interest. The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation." Blum, 465 U.S. at 895 n. 11, 104 S.Ct. 1541; Chambless, 885 F.2d at 1058-59. Working as a solo practitioner may be relevant to defining the market, See Chambless, 885 F.2d at 1059 ("smaller firms may be subject to their own prevailing market rate"), but it would be error to use an attorney's status as a solo practitioner as an automatic deduction or shortcut for determining the reasonable hourly rate.
 
 
 [7]
 The First Circuit has adopted a standard that allows district courts to assign different hourly rates depending on whether the task is a "core" or "non-core" taskSee, e.g., Brewster v. Dukakis, 3 F.3d 488, 492 n. 4 (1st Cir.1993) (defining "core" work as including "legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders" and defining "non-core" work as "less demanding tasks, including letter writing and telephone conversations"). We do not read Brewster as supporting the district court's blended hourly rate in this case because the district court appears to have assigned differing rates even to work the First Circuit would describe as "core."