15-3011(L)
In Re: Tremont Securities Law, State Law and Insurance Litigation

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of June, two thousand seventeen.

PRESENT: DENNIS JACOBS,
         CHRISTOPHER F. DRONEY,
              **Circuit Judges**,
         TIMOTHY C. STANCEU,[*]
              **Chief Judge, U.S. Court of Int'l Trade.**

- - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| IN RE: TREMONT SECURITIES LAW, STATE | 15-3011 (L) |
| LAW AND INSURANCE LITIGATION | 15-3241 (Con) |
| | 15-3251 (Con) |

- - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| **FOR APPELLANTS GEORGE** | VINCENT T. GRESHAM, Law |
| **TURNER, BINDLER LIVING** | Office of Vincent T. Gresham, |
| **TRUST, MADELYN HAINES,** | Atlanta, GA. |
| **JOHN JOHNSON, WILLIAM J.** | |
| **MILLARD TRUST, STELLA** | |

---

[*] Judge Timothy C. Stanceu, Chief Judge of the United States Court of International Trade, sitting by designation.

**RUGGIANO TRUST, WEST TRUST, PAUL ZAMROWSKI:**

**FOR APPELLANT MARY CATHERINE MARTIN, as the personal representative of the estate of Michael S. Martin:**

JOSHUA FRUCHTER, Wohl & Fruchter LLP, New York, NY.

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, P.C., Chestnut Ridge, NY.

**FOR APPELLANT PHILADELPHIA FINANCIAL LIFE ASSURANCE COMPANY:**

RICHARD G. HADDAD, Otterbourg P.C., New York, NY.

**FOR APPELLEES ARTHUR E. LANGE REVOCABLE TRUST, ARTHUR C. LANGE, NEAL J. POLAN, EASTHAM CAPITAL APPRECIATION FUND LP, NPV POSITIVE CORP., and all others similarly situated:**

ANDREW J. ENTWISTLE (Arthur V. Nealon, Robert N. Cappucci, on the brief), Entwistle & Cappucci LLP, New York, NY.

Reed R. Kathrein, Lee M. Gordon, Hagens Berman Sobol Shapiro LLP, Berkeley, CA.

**FOR APPELLEES ARTHUR M. BRAINSON, YVETTE FINKELSTEIN, GROUP DEFINED PENSION PLAN & TRUST, and all others similarly situated:**

Jeffrey M. Haber, Stephanie M. Beige, Bernstein Liebhard LLP, New York, NY.

**FOR APPELLEES DOLOS X LLC, DOLOS XI LLC, DOLOS XII LLC:**

IRWIN WARREN (Adam J. Bookman, Matthew S. Connors, on the brief), Weil, Gotshal & Manges LLP, New York, NY.

**FOR APPELLEE SPCP GROUP, LLC:**

Walter Rieman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY.

**FOR APPELLEE HSBC BANK PLC:**

Thomas J. Moloney, Joaquin P. Terceño, Cleary Gottlieb

2

Steen & Hamilton LLP, New York, NY.

**FOR APPELLEE THE ROYAL BANK OF SCOTLAND N.V.:** Michael S. Feldberg, Allen & Overy LLP, New York, NY.

**FOR APPELLEES NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, METROPOLITAN LIFE INSURANCE COMPANY, GENERAL AMERICAN LIFE INSURANCE COMPANY, NEW ENGLAND LIFE INSURANCE COMPANY, JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.), PACIFIC LIFE INSURANCE COMPANY, SECURITY LIFE OF DENVER, DELAWARE LIFE INSURANCE COMPANY, PRUCO LIFE INSURANCE COMPANY, NATIONWIDE LIFE INSURANCE COMPANY:** JOHN M. VASSOS (Mary C. Pennisi, on the brief), Morgan, Lewis & Bockius LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Griesa, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court be **AFFIRMED IN PART AND VACATED AND REMANDED IN PART.**

Appellants, investors in various hedge funds managed by Tremont Group Holdings, Inc. and its affiliates, appeal from a judgment of the United States District Court for the Southern District of New York (Griesa, J.), approving a post-settlement plan to allocate the liquidated assets of certain funds (the "Plan of Allocation," or "POA") and awarding attorneys' fees. For the reasons stated below, we affirm the district court's approval of the POA, but vacate and remand for a reduction of the fee award consistent with this order.

We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

Tremont Group Holdings and its affiliates managed two groups of hedge funds. The first, known as the "Rye Funds," invested all of their assets either with Bernard L. Madoff Investment Securities ("BLMIS") or, in the case of Rye Select Broad Market XL Fund, L.P. ("Rye XL"), in synthetic derivatives intended to mirror the returns of BLMIS. The Rye Funds include Rye Select Broad Market Fund, L.P. ("Rye Onshore"), Rye Select Broad Market Portfolio Limited ("Rye Offshore"), Rye Select Broad Market Insurance Fund, L.P. ("Rye Insurance"), Rye Select Broad Market Prime Fund, L.P. ("Rye Prime"), and Rye XL. Three of these (Rye Onshore, Rye Offshore, and Rye Insurance) invested directly with BLMIS and were "net losers," meaning they invested more money with BLMIS than they withdrew.

The second group of hedge funds, the "Tremont Funds," were "funds of funds," investing a portion of their assets in the Rye Funds (and therefore indirectly with BLMIS) and the rest in investments unrelated to BLMIS. Appellants largely invested in Tremont Funds.

When BLMIS collapsed in December 2008, investors in the Rye and Tremont Funds filed several putative class actions and derivative complaints against various entities and individuals responsible for the investment of fund assets with BLMIS. These actions were consolidated in 2009, with counsel (referred to herein as "Lead Counsel") appointed to represent all settling investors.

The parties to these consolidated actions settled in February 2011. That "Investor Settlement" created two separate escrow accounts: (1) the Net Settlement Fund ("NSF"), containing $100 million paid by the defendants in exchange for the release of all claims against them[1]; and (2) the Fund Distribution Account ("FDA"), containing all the assets that remained in the liquidated Rye Funds after claims by and against

---

[1] The NSF has already been distributed and is not at issue in this appeal.

4

the trustee of the BLMIS bankruptcy estate (the "Trustee") were resolved in separate litigation (the "Trustee Litigation").

In the Trustee Litigation, the three net-loser Rye Funds filed approximately $2.2 billion in claims against the Trustee under the Securities Investor Protection Act ("SIPA"). The Trustee, in turn, sought to claw back approximately $2.1 billion in avoidable transfers made to the Rye and Tremont Funds. In July 2011, a settlement (the "Trustee Settlement") was reached: the Rye and Tremont Funds collectively paid the Trustee $1 billion in cash; in exchange, the Trustee withdrew its avoidance claims against each of them and granted the net-loser Rye Funds roughly $2.2 billion in claims plus a claim for the return of eighty percent ($800 million) of the $1 billion payment pursuant to section 502(h) of the Bankruptcy Code. Thus, after the funds paid the Trustee $1 billion to settle the clawback claims against them,[2] the net-loser Rye Funds received claims totaling roughly $3 billion.

The FDA is composed almost entirely of those $3 billion in claims. It also includes $32.4 million in cash remaining in Rye XL (a Rye Fund that did not have to contribute to the $1 billion Trustee Settlement). It is expected that a total of around $1.45 billion will eventually flow into the FDA from the Trustee.[3]

The allocation of the FDA was not part of the Investor Settlement. Nevertheless, the parties agreed that a "plan of allocation [would] be approved by the [District] Court," J.A.

---

[2] The $1 billion payment by the funds to the Trustee was collected as follows: the three net-loser Rye Funds contributed a combined $212 million of their own money plus $650 million they borrowed from Fortress Investment Group, LLC ("Fortress"); the Tremont Funds and one of the net-winner Rye Funds (Rye Prime) contributed the remaining $138 million.

[3] As of September 2015, approximately $650 million had already poured into the FDA. Another $650 million was recovered from the Trustee and never reached the FDA because it was used to repay the Fortress loan.

5

285, and the court explicitly retained jurisdiction over the FDA's allocation.

In its 2011 final judgment approving the Investor Settlement, the district court tasked Lead Counsel with responsibility for proposing a plan of allocation.  In April 2014, Lead Counsel solicited proposed plans from interested parties and notified them of mediation to resolve the allocation issue.  After more than a year of mediation among numerous parties (including multiple appellants), a consensus plan of allocation (the "POA") emerged.

Under the POA -- which is supported by investors holding approximately ninety-seven percent of the net equity in the funds -- FDA assets are distributed as follows.

First, the $32.4 million that Rye XL contributed to the FDA is returned to Rye XL investors.

Next, the funds are awarded equal priority to the balance of the FDA using a simple formula: (1) each net-loser Rye Fund has a claim (referred to as a "SIPC Claim") equal to its portion of the $3 billion Trustee Settlement; (2) each Tremont and net-winner Rye Fund that contributed cash to the Trustee Settlement has a "Virtual SIPC Claim" equal to eighty percent of its Trustee Settlement contribution.

Finally, once the money is allocated to the appropriate funds using the formula described above, each fund's investors will receive a pro rata share of the fund's allocation according to the investor's net equity (i.e., amount lost) in that fund.  In other words, only investors who lost money in a given fund due to that fund's investment in BLMIS are entitled to recover anything from the fund.  Thus, net-loser investors in any fund will recover a share of that fund's SIPC or Virtual SIPC Claim; and net-loser investors in any net-loser fund will recover a share of that fund's cross-investment in each Rye Fund in which it was invested.

In September 2015, after a three-hour hearing regarding allocation of the FDA, the district court issued a written opinion approving the POA, rejecting an alternative plan proposed by appellant Michael S. Martin, granting Lead

6

Counsel's motion for attorneys' fees, and overruling all objections.  Appellants appeal the court's approval of the POA and award of attorneys' fees.

We review a district court's allocation of settlement funds and award of attorneys' fees for abuse of discretion.  See In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 179, 181 (2d Cir. 1987) (settlement funds); Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47 (2d Cir. 2000) (attorneys' fees).

**1.**  There are unusual features to this appeal.  We are reviewing an allocation of assets that were obtained in unrelated litigation and that are being held in an account created for the purpose of allocation by a settlement that is not being challenged.  Further complicating matters, those assets represent the liquidated remains of a group of hedge funds (the Rye Funds) that imploded after Madoff's Ponzi scheme was revealed.  Unlike a typical settlement fund distribution plan, the POA is separate from the underlying settlement, involves assets that are already earmarked for the potential recipients (the investors in the liquidated hedge funds), and is the product of mediation between those recipients.  These circumstances, however, do not disturb the traditional deference we owe to the district court's equitable allocation of settlement-related funds.[4]

The district court did not abuse its discretion in approving the POA.  The POA is fair and reasonable, as was the mediation process that produced it.  See In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 133 (S.D.N.Y. 1997), aff'd, 117 F.3d 721 (2d Cir. 1997) (per curiam) ("As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and

---

[4] Nor does this peculiar procedural posture deprive the district court of jurisdiction over the FDA's allocation.  Although the Investor Settlement did not include a plan of allocation, it authorized the court to adopt such a plan, and the court explicitly retained jurisdiction over "all matters relating to" the Investor Litigation, including allocation of the FDA.  J.A. 642.

whether the proposed apportionment is fair and reasonable in light of that information.").

First, the POA reflects the net-loser Rye Funds' superior claim to the proceeds of the Trustee Settlement. See In re Corrugated Container Antitrust Litig., 643 F.2d 195, 220 (5th Cir. 1981) ("It is self-evident that if the settlement's adequacy rests on the value of one set of claims, distribution of the settlement should be weighed heavily in favor of plaintiffs whose claims comprise that set."). That settlement granted roughly $3 billion in claims exclusively to these three funds because only they were net-loser BLMIS customers. See In re Bernard L. Madoff Inv. Secs. LLC, 654 F.3d 229, 238 (2d Cir. 2011) (limiting SIPA recovery to net-loser BLMIS customers). To be sure, the Tremont and net-winner Rye Funds contributed $138 million to the Trustee Settlement, and that contribution helped enable the net-loser Rye Funds to receive their $800 million section 502(h) claim. But the Tremont and net-winner Rye Funds' $138 million contribution was not selfless: the payment settled the clawback claims against them. And, in any event, that contribution is recognized by the allowance of Virtual SIPC Claims, which are calculated on the same eighty-percent basis as the net-loser Rye Funds' section 502(h) claim.

Second, the POA reflects the net-loser Rye Funds' greater victimization by BLMIS. Unlike the other funds, they invested their entire portfolio with BLMIS and incurred enormous losses.

Third, the Tremont Funds were exposed to Madoff's fraud only through their cross-investments in Rye Funds. Under the POA, Tremont Funds, like all Rye Fund investors, are compensated for their Madoff losses.

Fourth, the POA adopts the net equity principle of allocation that this Court has previously endorsed with respect to Madoff's Ponzi scheme. This principle holds that, because net winners were given money stolen from net losers, only net losers have an equitable right to recovery. See id. at 235, 238.

Fifth, the POA respects the separate legal status of the funds. Rather than pool all of the Trustee Settlement proceeds

8

into one pot for distribution directly to the individual investors -- as the rejected plan proposed by Martin would do -- the POA first allocates the proceeds according to the claims held by the funds. This is appropriate given that the FDA arises from the derivative claims brought on behalf of the funds in the Investor Litigation.

Finally, the POA provides for the priority distribution of $32.4 million to Rye XL's investors in recognition of Rye XL's direct cash contribution to the FDA in that amount.

Thus, in sum, the POA is based on fair and equitable principles. It is the product of protracted, contentious mediation in which numerous Rye and Tremont Fund investors with diverse interests participated through counsel.[5] Attorneys for two of the appellants (Martin and Philadelphia Financial Life Assurance Company) took part in the mediation and advocated on their clients' behalf. The retired federal judge who served as the mediator attested to the inclusive and hard-fought nature of the negotiations, the numerous compromises made, the opportunity for all parties to advance their positions, and the fairness of the POA. And the district court provided ample opportunity for appellants and other interested parties to voice their concerns and submit competing proposals before it decided to allocate the FDA according to the POA.

Given these facts, and the fair terms of the POA (including significant concessions to Tremont and net-winner Rye Fund investors in the form of Virtual SIPC Claims), the district court did not abuse its discretion in concluding that appellants' interests were adequately represented and protected.[6] See In re Literary Works in Elec. Databases

_____

[5] The Tremont Funds' interests were represented at mediation not only by the several Tremont Fund investors who attended, but also by: (1) Rye Fund investors, who, like the Tremont Funds, were exposed to Madoff's fraud through their investments in the Rye Funds; and (2) investors in Rye Prime, which, like the Tremont Funds, contributed cash to the Trustee Settlement without receiving a claim in return.

[6] Accordingly, the district court's denial of Martin's 2015 motion to certify a subclass of Tremont Fund investors pursuant

_Copyright Litig._, 654 F.3d 242, 252 (2d Cir. 2011) ("The Supreme Court's decision in Amchem . . . allows courts, in assessing the adequacy of representation, to examine a settlement's substance for evidence of prejudice to the interests of a subset of plaintiffs.").

**2.** The POA allows a recovery only to investors who suffered a net loss in the Madoff Ponzi scheme. Appellants argue that this conflicts with the Investor Settlement, which they claim entitles every investor to recover. Appellants' argument rests on ¶ 1.18 of the Investor Settlement, which defines "Fund Distribution Claimant" as "any limited partner or shareholder in any of the Settling Funds . . . , _each of which shall be entitled to receive a disbursement_ from the [FDA]." J.A. 263-64 (emphasis added).

Paragraph 1.18 of the Investor Settlement does not impugn the POA. The Investor Settlement explicitly stated that allocation of the FDA would be decided separately. It is implausible that the parties intended to drastically limit the terms of that allocation through a vague reference to entitlement buried in the definitional section of the settlement.

Viewed in context, ¶ 1.18 is more naturally read as a statement of eligibility, rather than a guarantee of recovery. See Huertas v. East River Hous. Corp., 992 F.2d 1263, 1267 (2d Cir. 1993) ("[A] court may look to certain aids, such as the circumstances surrounding a settlement agreement's formation, when construing it for enforcement purposes.").

**3.** Philadelphia Financial contends that the POA should be rejected because it conflicts with the funds' governing documents. Many of the funds are limited partnerships whose partnership agreements dictate the allocation of assets, including upon liquidation. The partnership agreements generally require that assets of the fund be distributed

---

to Federal Rule of Civil Procedure 23 was not an abuse of discretion. Moreover, because the POA was a mechanism to resolve the derivative (rather than class action) claims in this litigation, Rule 23 is arguably inapplicable.

proportionally according to the value of each investor's capital account, whereas the POA distributes FDA assets based on an investor's net equity in a given fund.

However, the Investor Settlement rendered the funds' governing documents irrelevant for purposes of allocation. When the funds and their investors signed the Investor Settlement, all assets flowing into the FDA became subject to equitable distribution by the district court. See J.A. 285, ¶ 2.23 (explaining that the FDA will be disbursed to the funds' limited partners and shareholders pursuant to a plan of allocation approved by the district court). In other words, because the POA determines how the FDA is distributed to investors, the funds' partnership agreements do not control. And because the partnership agreements would not allocate assets more fairly than the POA (and would risk giving effect to Madoff's fictitious account statements), the district court did not abuse its discretion in ignoring them.

**4.** Martin claims that the mediation was tainted by secret, collusive side-deals, and that the district court erred in denying his motion for disclosure of all agreements reached during the mediation process. Martin relies on Federal Rule of Civil Procedure ("Rule") 23(e)(3), which requires that parties seeking approval of a proposed class action settlement "file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3).

As an initial matter, Rule 23, which governs class actions, is arguably not controlling here. The FDA, unlike the NSF, resolves the non-class derivative claims in this litigation.

In any event, all mediation attendees signed a confidentiality agreement which covered "all statements of the parties, counsel, and mediators, as well as the materials generated solely for purposes of the mediation." J.A. 1691. Attendees also orally agreed "that the entire mediation process and all communications, negotiations and agreements pursuant thereto were covered with a complete cloak of confidentiality and must remain confidential, including in particular, being off limits from discovery, court papers, arguments or other

11

Court proceedings, absent further agreement by the parties." J.A. 2178.

Rule 23 does not require disclosure of all agreements made during confidential mediation. As we have observed:

> A party seeking disclosure of confidential mediation communications must demonstrate (1) a special need for the confidential material, (2) resulting unfairness from a lack of discovery, and (3) that the need for the evidence outweighs the interest in maintaining confidentiality. All three factors are necessary to warrant disclosure of otherwise non-discoverable documents.

Savage & Assocs. P.C. v. K&L Gates LLP (In re Teligent, Inc.), 640 F.3d 53, 58 (2d Cir. 2011) (citations omitted).

The district court found that there was no reason to believe that any agreements reached during mediation were collusive, and that the need for confidentiality outweighed the need for disclosure. Given the importance of encouraging mediation in this tangled matter, the mediator's testimony regarding the fairness of the negotiations and the evident fairness of the POA, the district court did not err in denying Martin's motion to revoke confidentiality. See id. at 59-60 ("Were courts to cavalierly set aside confidentiality restrictions on disclosure of communications made in the context of mediation, parties might be less frank and forthcoming during the mediation process or might even limit their use of mediation altogether.").

**5.** Appellants (with the exception of Martin) argue that the district court erred in awarding Lead Counsel a fee equal to three percent of the FDA,[7] capped at two-and-a-half times the "lodestar" of counsel's hourly rate multiplied by hours worked.[8] If, as the parties anticipate, the Trustee pays approximately

---

[7] The three percent is not applied against Rye XL's $32.4 million priority distribution.

[8] The district court also awarded Lead Counsel nearly $1 million in expenses.

12

$1.45 billion into the FDA, this cap will likely be triggered and Lead Counsel will receive in excess of $40 million.

"We review a district court's award of attorney's fees for abuse of discretion, which occurs when (1) the court's decision rests on an error of law (such as application of the wrong legal principle) or clearly erroneous factual finding, or (2) its decision -- though not necessarily the product of a legal error or a clearly erroneous factual finding -- cannot be located within the range of permissible decisions."  McDaniel v. Cty. of Schenectady, 595 F.3d 411, 416 (2d Cir. 2010) (internal citation, quotation marks, and brackets omitted).

In absolute terms, an award of three percent of a common fund is not excessive, as numerous opinions confirm.[9]  However, the calculation is guided by several (non-exclusive) factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  Goldberger, 209 F.3d at 50 (alterations and quotation marks omitted).  Further, fee awards should be approached "with an eye to moderation," and "should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund."  Id. at 53 (internal quotation marks omitted).

---

[9] See, e.g., In re Nortel Networks Corp. Secs. Litig., 539 F.3d 129, 134 (2d Cir. 2008) (affirming fee award equal to 3% of $438 million fund and acknowledging that fee was "toward the lower end of reasonable fee awards"); Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 123 (2d Cir. 2005) (affirming fee award equal to 6.5% of $3.38 billion common fund); Goldberger, 209 F.3d at 52 (observing that "empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%"); Carlson v. Xerox Corp., 596 F. Supp. 2d 400, 414 (D. Conn. 2009), aff'd, 355 F. App'x 523 (2d Cir. 2009) (summary order) (awarding fee equal to 16% of $750 million common fund).

13

The district court concluded that the Goldberger factors supported Lead Counsel's requested fee, stating in relevant part:

> In its work on the FDA, [Lead] Counsel has unquestionably put forth great labor.  Furthermore, the litigation has been highly complex, involving a great deal of unsettled law, many parties, and a voluminous case history.  [Lead] Counsel has displayed great skill in managing these challenges.  Objectors uncharitably characterize [Lead] Counsel as mere "administrators" of the FDA.  In fact, [Lead] Counsel's driving role in structuring the FDA as part of the [Investor] Settlement, and thereafter working to mediate conflicts and effect a fair and expedient distribution of the funds, has gone well beyond rote administration.  In short, the allocation and distribution of the FDA is a complex matter of great importance to many parties, and [Lead] Counsel has performed admirably. . . .  [T]his litigation involved unique practical and legal challenges.  The outcome of [Lead] Counsel's labor was never certain.

In re Tremont Sec. Law, State Law & Ins. Litig., No. 08-CV-11117, 2015 WL 5333494, at *10, 2015 U.S. Dist. LEXIS 122204, at *36–38 (S.D.N.Y. Sept. 14, 2015).

We do not question the district court's characterization of Lead Counsel's performance or the complexity or importance of this matter.  However, we think the court gave insufficient consideration to the lack of contingency risk, and that factor is generally the most important in determining whether to award a lodestar multiplier.  Goldberger, 209 F.3d at 54 ("We have historically labeled the risk of success as perhaps the foremost factor to be considered in determining whether to award an enhancement." (internal quotation marks omitted)).

The district court identified two risks Lead Counsel supposedly faced.  Neither supports Lead Counsel's requested 2.5 lodestar multiplier.

The first identified risk was "in bringing the derivative claims that gave rise to the inclusion of the FDA as part of

14

the [Investor] Settlement." In re Tremont, 2015 WL 5333494, at *9, 2015 U.S. Dist. LEXIS 122204, at *34. This is not a proper consideration in relation to this particular fee award. First, Lead Counsel was already compensated for the risk in bringing the derivative (i.e., state law) claims in the fee award for the August 2011 Investor Settlement. See J.A. 617 (stating that the 2011 fee award compensated Lead Counsel for "their respective contributions in the prosecution of the State Law Actions and the Securities Actions"); J.A. 619 (finding that had Lead Counsel "not achieved the Settlement, a significant risk would remain that State Law and Securities Plaintiffs and the State Law and Securities Subclasses may have recovered less or nothing").

Second, Lead Counsel is requesting fees for work completed only *after* the district court approved the Investor Settlement in August 2011.[10] It does not do to multiply the fee award here -- which is based on hours worked after the Investor Settlement -- in order to compensate a risk that dissipated when the court approved that settlement.

Third, the hundreds of millions of dollars that have been flowing into the FDA were essentially guaranteed by the July 2011 settlement in the Trustee Litigation, a separate case led by separate counsel (who already took their cut) involving money obtained by the Trustee (who is also being compensated). There is no reason to award Lead Counsel a lodestar multiple based on the size of a recovery they did not secure.[11] Nor was there ever a real possibility that the FDA would be so insignificant

---

[10] More specifically, Lead Counsel is seeking fees for work completed from May 2011 through August 2015. The district court approved the Investor Settlement and the initial fee award in August 2011. However, Lead Counsel submitted the initial fee request in May 2011, which explains why they are now seeking fees from May 2011 to August 2011 in addition to fees for work involving the FDA POA after approval of the settlement.

[11] Although Lead Counsel was responsible for securing the $100 million NSF, they were paid a thirty-percent fee for that.

15

that Lead Counsel might be deprived of rich compensation for their work relating to it.

The second risk identified by the district court was the "risk[] in defending the Plan of Allocation against objectors." In re Tremont, 2015 WL 5333494, at *9, 2015 U.S. Dist. LEXIS 122204, at *35. However, Lead Counsel's fee award is not tied to any particular plan of allocation; rather, it is dependent on the size of the FDA (which is a product of the Trustee's efforts) and the lodestar -- which only increased as the number of objections to the POA (and thus Lead Counsel's hours spent defending it) grew. Accordingly, there appears to have been little (if any) risk in defending the POA against objectors, except for the remote possibility that the district court would refuse to approve *any* plan of allocation submitted by Lead Counsel.

Given the lack of contingency risk, a lodestar multiplier cap of 2.5 "cannot be located within the range of permissible decisions." McDaniel, 595 F.3d at 416; see also City of Detroit v. Grinnell Corp., 495 F.2d 448, 471 (2d Cir. 1974), abrogated on unrelated grounds by Goldberger, 209 F.3d at 49-50 ("The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee."). A lodestar multiplier of 2.5 would be considered high for a standard common fund case in this Circuit.[12] At the same time, virtually all the cases that feature a multiplier are those in which, unlike

---

[12] See, e.g., In re Citigroup Inc. Secs. Litig., 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013) (citing data regarding lodestar multipliers in securities class action settlements and observing that a multiplier of 2.8 is "high"); In re Merrill Lynch & Co. Research Reports Secs. Litig., No. 02 MD 1484, 2007 WL 313474, at *23, 2007 U.S. Dist. LEXIS 9450, at *75 (S.D.N.Y. Feb. 1, 2007) (ruling that "an award that equates to a multiplier of 2.43 of the lodestar is excessive"); In re Twinlab Corp. Secs. Litig., 187 F. Supp. 2d 80, 87 (E.D.N.Y. 2002) (describing counsel's requested multiplier of 3.58 as "inconsistent with post-Goldberger courts which have generally refused multipliers as high as 2.03").

here, the fund was collected by the efforts of counsel with an inherent risk that the litigation would yield less or none.

We therefore remand so that the district court can revise the cap to reflect counsel's limited risk.[13]  The specific recalculation, of course, remains subject to the district court's sound discretion.  Although a cap of 2.5 times the lodestar is excessive, one equal to the lodestar is not necessarily required.

---

[13] Appellants George Turner, Bindler Living Trust, Madelyn Haines, John Johnson, William J. Millard Trust, Stella Ruggiano Trust, West Trust, and Paul Zamrowski challenge the lodestar multiplier cap on the additional grounds that the district court relied on time summaries (rather than contemporaneous time records) and Lead Counsel's hourly rates.  With respect to time records, although they are ordinarily required, see Scott v. City of New York, 626 F.3d 130, 133-34 (2d Cir. 2010) (per curiam), the district court may rely on summaries that are based on voluminous contemporaneous records.  See Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994) ("A review of the submissions made by [counsel] shows that they made contemporaneous entries as the work was completed, and that their billing [summary] was based on these contemporaneous records.  We believe this falls sufficiently within the meaning of 'contemporaneous' . . . .").  However, the sparse summaries provided by Lead Counsel are of doubtful adequacy.  Therefore, on remand, the district court should require the submission of more detailed summaries that, at the very least, break down the hours worked by year and task.  With respect to the district court's use of counsel's hourly rates to calculate the lodestar, we find no abuse of discretion.  Given the skill and experience required in this complex securities litigation, we cannot conclude that those rates were unreasonable.

Accordingly, and finding no merit in appellants' other arguments, we hereby **AFFIRM** the judgment of the district court with respect to the plan of allocation and **VACATE AND REMAND** with respect to the fee award.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK